**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Guardian Flight, LLC, | ) | **ORDER ON MOTIONS** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Jon Godfread, in his capacity as North | ) | Case No. 1:18-cv-007 |
| Dakota Insurance Commissioner; Wayne | ) | |
| Stenehjem in his capacity as North Dakota | ) | |
| Attorney General, | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court is the Plaintiff's Motion for Judgment on the Pleadings filed on March 2, 2018. See Doc. No. 10. The Defendants filed a brief in opposition to the motion and a cross-motion for judgment on the pleading or alternatively for summary judgment on March 23, 2018. See Doc. No. 14. On April 6, 2018, the Plaintiff filed a reply brief. See Doc. No. 19. The Plaintiffs also filed three notices of supplemental authority to which the Defendants filed one response. See Doc. Nos. 20, 24, 26, and 27. For the reasons set forth below, both motions are granted in part and denied in part.

I. **BACKGROUND**

A. **THE PARTIES**

The Plaintiff Guardian Flight LLC ("Guardian Flight") provides air ambulance services in North Dakota and many other states around the country. It is organized under the laws of Delaware and has its headquarters and principal place of business in Salt Lake City, Utah. Guardian Flight is the successor in interest to Valley Med Flight, Inc. ("Valley Med Flight"). On July 19, 2017,

Valley Med Flight and several affiliated air ambulance companies were purchased by Air Medical Group Holdings, Inc. ("AMGH"). As of November 22, 2017, Valley Med Flight's North Dakota emergency air ambulance operations were transferred to Guardian Flight, and as of December 29, 2017, all related FAA Part 135 air ambulance operations were transferred to Guardian Flight. Guardian Flight is registered with the North Dakota Secretary of State to do business as Valley Med Flight.

Defendant Jon Godfread is the North Dakota Insurance Commissioner. North Dakota law empowers the Insurance Commissioner to issue cease and desist orders respecting violations of Title 26.1, and to bring an action in state court to enjoin any acts or practices which are prohibited by Title 26.l. See N.D.C.C. §§ 26.1-01-03.1 and 26.1-01-03.2. The Insurance Commissioner may also seek administrative penalties for violations of Title 26.1. N.D.C.C. § 26.1-01-03.3.

Defendant Wayne Stenehjem is the North Dakota Attorney General. He investigates and prosecutes any violations of state law, and is authorized by law 'to institute and prosecute all cases in which the state is a party, whenever in their judgment it would be for the best interests of the state so to do." N.D.C.C.. § 54-12-02.


## B.    GUARDIAN FLIGHT AIR AMBULANCE SERVICES

Guardian Flight is a federally regulated air carrier which provides air ambulance services in North Dakota and around the country. It maintains a fleet of air ambulances ready to promptly respond to medical emergencies, often in rural or remote locations that lack sophisticated medical services. Guardian Flight's air ambulances transport patients facing serious or life-threatening emergencies, while providing medical care during the flight.

As an emergent care provider, Guardian Flight may be dispatched by first responders, the emergency department of a hospital, or by an attending physician. Guardian Flight does not self-dispatch. Where a covered hospital or attending physician orders a transport, the regulations and procedures set out by the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, generally apply. North Dakota regulations require air ambulances to provide adequate care when called in emergency situations. See N.D. Admin. Code § 33-36-01-05(8), (12), (16). Under state law, air ambulance providers may only refuse care in specified non-emergent situations. See N.D.C.C. § 23-27-04.

In keeping with federal and state law, Guardian Flight transports patients regardless of their insurance status or ability to pay. Air ambulance services are extremely expensive. The median price charged by air ambulance service providers nearly doubled between 2010 and 2014. The amount Guardian Flight is reimbursed for its services depends in part on the patient's insurance coverage and whether Guardian Flight is an in-network or out-of-network provider with a particular insurance company. Due to the nature of the need for an air ambulance, patients have little or no control over which air ambulance service provider is used. Medicaid and Medicare reimbursement rates are limited and substantially below Guardian Flight's billed charges. Similarly, Guardian Flight generally recovers very little from patients who are uninsured. The cost of undercompensated care is shifted to and borne by other payors such as commercial insurers and patients. The portion of the billed charges which are not covered by insurance, which can run into the tens of thousands of dollars, is ultimately the responsibility of the patient.

These large and unexpected bills lead many patients to complain to the North Dakota Insurance Department. North Dakota has twice passed legislation in an attempt to remedy the

problem. The first attempt was found to be preempted by the Airline Deregulation Act ("ADA"). See Valley Med Flight, Inc. v. Dwelle, 171 F. Supp. 3d 930 (D.N.D. 2016). It is the second attempt, SB 2231, which is the subject of this declaratory judgment action.

### C.    GUARDIAN FLIGHT SUBSCRIPTION MEMBERSHIP PROGRAM

In most states in which it operates, Guardian Flight offers a subscription membership program. In exchange for a membership fee of less than $100 per year, Guardian Flight considers any air ambulance charges beyond the amount paid by a member's insurance or other third parties to be prepaid by the member. Guardian Flight offers this membership program as part of an alliance of air ambulance providers affiliated under the name "AirMedCare Network." The same parent company, AMGH, owns each of the AirMedCare Network companies. Persons who purchase an AirMedCare Network subscription are automatically enrolled in the membership program for each of the air ambulance companies in the AirMedCare Network.

The program allows members to partially prepay Guardian Flight for the services it provides. The membership program does not guarantee service. Members cannot contact Guardian Flight or any other AirMedCare Network provider to provide transport when services are needed, and Guardian Flight is not required to indemnify or pay any specified amount to members or to third-party providers if the member is ultimately transported by an air ambulance service that is not part of the AirMedCare Network. If the patient is a member, the portion of the billing which is the responsibility of the patient is considered prepaid by the membership fee.

Until the passage of SB 2231 in 2017, Guardian Flight's predecessor (Valley Med Flight) offered this membership program in North Dakota and had hundreds of members. SB 2231 prohibits

subscription agreements. Guardian Flight would like to offer a subscription membership program in North Dakota but is prohibited from doing so by SB 2231.

**D.**    **SB 2231**

In 2015, in an attempt to protect patients from enormous bills for air ambulance services, the North Dakota Legislature passed HB 1255 which created air ambulance call lists, required air ambulance providers to provide fee schedules upon request, and created a fee schedule for workers' compensation cases. Dwelle, 171 F. Supp. 3d at 934. The Court determined that HB 1255 was preempted by the ADA and the McCarran-Ferguson Act did not provide reverse preemption protection because the law did not regulate the business of insurance. Id. at 942-45. The State did not appeal.

In 2017, the North Dakota Legislature again tried to remedy the situation by passing SB 2231. SB 2231 is codified at N.D.C.C. §§ 26.1-47-08 and 26.1-47-09. Section 26.1-47-09(3) provides a payment by an insurer to a provider for air ambulance services to be a full and final payment with no option for the provider to seek the balance form the patient. Section 26.1-47-08 prohibits air ambulance subscription agreements. The two provisions provide as follows:

> An air ambulance provider, or an agent of an air ambulance provider, may not sell, solicit, or negotiate a subscription agreement or contract relating to services or the billing of services provided by an air ambulance provider. An air ambulance provider, or agent of an air ambulance provider, which violates this section is subject to a civil fine in an amount not to exceed ten thousand dollars for each violation. The fine may be collected and recovered in an action brought in the name of the state.

N.D.C.C. § 26.1-47-08.

> 1. A health benefit plan may not be issued in this state unless the plan provides the reimbursement rate for out-of-network air ambulance provider services is equal to the

average of the insurer's in-network rates for air ambulance providers in the state.

2. An insurer may not use the average of an insurer's in-network rates for air ambulance providers in the state in order to decrease current or future contractual rates between an insurer and an air ambulance provider.

3**. For purposes of settling a claim made by the insured for air ambulance services, a payment made by an insurer under the plan in compliance with this section is deemed to be the same as an in-network payment and is considered a full and final payment by the insured for out-of-network air ambulance services billed to the insured.**

4. This section does not apply to a policy or certificate of insurance, whether written on a group or individual basis, which provides coverage limited to:

    a. A specified disease, a specified accident, or accident-only coverage;
    b. Credit;
    c. Dental;
    d. Disability;
    e. Hospital;
    f. Long-term care insurance as defined by chapter 26.1-45;
    g. Vision care or any other limited supplemental benefit;
    h. A Medicare supplement policy of insurance, as defined by the commissioner by rule or coverage under a plan through Medicare;
    i. Medicaid;
    j. The federal employees health benefits program and any coverage issued as a supplement to that coverage;
    k. Coverage issued as supplemental to liability insurance, workers' compensation, or similar insurance; or
    l. Automobile medical payment insurance.

N.D.C.C. § 26.1-47-09 (emphasis added).

Guardian Flight filed this declaratory judgment action on January 12, 2018, contending Sections 26.1-47-08 ("Subscription Provision") and 26.1-47-09(3) ("Payment Provision") are preempted by the ADA. Defendants Godfread and Stenehjem (collectively "State") maintain the the challenged provisions regulate insurance and thus are not preempted. In addition, the State contends the McCarran-Ferguson Act reverse preemption provision acts to protect the provisions

from preemption.

## II.    STANDARD OF REVIEW

Rule 12(c) of the Federal Rules of Civil Procedure establishes that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." "Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law." <u>Faibisch v. Univ. of Minn.</u>, 304 F.3d 797, 803 (8th Cir. 2002) (citing <u>United States v. Any & All Radio Station Transmission Equip.</u>, 207 F.3d 458, 462 (8th Cir. 2000)).  When presented with a motion for judgment on the pleadings, a district court must "accept as true all factual allegations set out in the complaint" and "construe the complaint in the light most favorable to the plaintiff, drawing all inferences in his favor." <u>Wishnatsky v. Rovner</u>, 433 F.3d 608, 610 (8th Cir. 2006).  The standard for judgment on the pleadings is the same as that for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  <u>Ashley County, Ark. v. Pfizer, Inc.</u>, 552 F.3d 659, 665 (8th Cir. 2009).

> When considering a motion for judgment on the pleadings (or a motion to dismiss under Fed. R. Civ. P. 12(b)(6)), the court generally must ignore materials outside the pleadings, but it may consider "some materials that are part of the public record or do not contradict the complaint," as well as materials that are "necessarily embraced by the pleadings."

<u>Porous Media Corp. v. Pall Corp.</u>, 186 F.3d 1077, 1079 (8th Cir. 1999) (internal citations omitted).

## III.    LEGAL DISCUSSION

### A.    ADA (AIRLINE DEREGULATION ACT OF 1978) PREEMPTION

"It is a familiar and well-established principle that the Supremacy Clause, U.S. Const., Art.

VI, cl. 2, invalidates state laws that 'interfere with, or are contrary to,' federal law." Hillsborough Cty., Fla. v. Automated Med. Labs., Inc., 471 U.S. 707, 712 (1985) (internal citations omitted). This invalidation is accomplished by way of federal preemption, which "is invoked under the directive of the Supremacy Clause." Brown v. Hotel and Rest. Emps. and Bartenders Int'l Union Local 54, 468 U.S. 491, 500 (1984); see also Kurns v. R.R. Friction Prods. Corp., 565 U.S. 625, 630 (2012) (stating preemption of state law occurs through the direct operation of the Supremacy Clause).

Under the Supremacy Clause, federal law may supersede, or preempt, state law in several different ways: (1) Congress may expressly state that federal law preempts state law (express preemption); (2) Congress' intent to preempt state law may be inferred from its comprehensive regulation of an area of law (field preemption); or (3) state law may actually conflict with the federal law (conflict preemption) – i.e., where compliance with both federal law and state law is impossible, or where the state law stands in the way of the accomplishment and execution of the purposes and objectives of Congress. Hillsborough, 471 U.S. at 713; see also Gunter v. Farmers Ins. Co., Inc., 736 F.3d 768, 771 (8th Cir. 2013). Congress may evince its intent to pre-empt state law either implicitly or explicitly. Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992). Federal regulations can have the same preemptive effect as federal law. Gunter, 736 F.3d at 771-72.

The ADA contains an express preemption clause which provides as follows:

(b) Preemption.--(1) Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law **related to** a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1) (emphasis added). It is undisputed that Guardian Flight is an "air carrier" and the challenged laws have the "force and effect of law."

The United States Supreme Court has on three occasions offered important guidance as to how the ADA's express preemption clause is to be construed. Morales v. Trans World Airlines, Inc, 504 U.S. 374 (1992); Am. Airlines, Inc. v. Wolens, 513 U.S. 219 (1995); Northwest, Inc., v. Ginsberg, 572 U.S. 273 (2014)  The ADA was enacted in 1978 after Congress determined that deregulation of the airline industry would lead to greater reliance on market forces resulting in greater efficiency, innovation, lower prices, and enhanced quality and variety of air transportation services. Morales v. Trans World Airlines, Inc, 504 U.S. 374, 378 (1992).  In order to prevent the states from circumventing federal deregulation by enacting their own regulation of the airline industry, Congress included a broad preemption clause in the ADA prohibiting the states from enforcing any law or regulation related to an air carrier's rates, routes, or services.  Id. at 383-84. In Morales, the United States Supreme Court held that the ADA expressly preempted the application of state deceptive business practice laws to airline fare advertisements because such regulation related to the content and format of air carrier fare advertising and had a significant impact thereon. Id. at 388-91.  The Supreme Court explained the ADA's broad preemption clause meant state laws and regulations "having a connection with or reference to airline rates, routes, or services, are pre-empted" by the ADA.  Id. at 384.  More important, even an indirect effect occasioned by laws of general applicability is sufficient to meet the "relating to" language in the preemption clause.  Id. at 386-87.  Laws which are consistent with the ADA's purpose are preempted nevertheless.  Id. However, the Supreme Court noted that in some cases the regulations might have too tenuous or remote an impact to be preempted.  Id. at 387, 390.

The United States Supreme Court reaffirmed in Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 224 (1995) the breadth of the ADA's preemption clause.  In Wolens, the plaintiffs were participants

in American Airlines frequent flyer program who claimed to be injured by modifications to the program and brought suit claiming breach of contract and violation of the Illinois Consumer Fraud Act. Id. at 224-25. The Supreme Court held the Illinois Consumer Fraud Act claims were preempted by the ADA while the breach of contract claims were not preempted. Id. at 226. The Supreme Court explained that the frequent flyer program in question related to rates because the airline gave mileage credits for free tickets and upgrades and services and because the program provided access to flights and service class upgrades regardless of capacity controls and blackout dates. Id. The Supreme Court noted the Illinois Consumer Fraud Act was prescriptive, controlled conduct, and served as a means of policing the marketing practices of airlines. Id. at 227-28. Given the text and purpose of the Illinois Consumer Fraud Act, it was preempted by the ADA. Id. at 228. The breach of contract claims on the other hand were not preempted because a breach of contract claim does not allege a violation of a state-imposed obligation but rather alleges violation of a self-imposed obligation. Id. The terms and conditions of a frequent flyer program are privately ordered obligations. Id. ADA preemption only applies to state laws and regulations. Id. at 229. The Supreme Court stressed that the purpose of the ADA was to promote market efficiency and the ability to enforce private contracts through a breach of contract action was fundamental to a stable and efficient market. Id. at 230. Any sensible construction of the ADA required that agreements freely made not be preempted.

In Northwest, Inc., v. Ginsberg, 572 U.S. 273, 276 (2014), the Supreme Court held that a airline customer's claim for breach of the implied covenant of good faith and fair dealing was preempted by the ADA. The airline had terminated the customer's membership in the airline's frequent flyer program based on alleged abuse of the program. The customer sued alleging, among

other things, the termination of his membership violated the implied covenant of good faith and fair dealing. Id. at 278. The Supreme Court explained that even state common law rules like the implied covenant of good faith and fair dealing are preempted by the ADA because the ADA preemption provision was very broadly worded, and exempting common law claims would be contrary to the central purpose of the ADA. Id. at 281-82. The Supreme Court stressed that what was important was the effect of the state law, provision, or regulation and not its form and state common law rules can undermine the purpose of the ADA just as surely as statutes and regulations. Id. at 283. The Supreme Court further explained that the claim in question was clearly related to "rates, routes, or services" because the plaintiff sought reinstatement in the airline's frequent flyer program so that he could accrue mileage credits which could be redeemed for tickets and upgrades. Id. at 283-84. In addition, the implied covenant claim was a state-imposed obligation rather than one the parties voluntarily undertook because the parties cannot contract out of the covenant. Id. at 285-86.

With this background in mind, the Court will turn to the question of whether the ADA preempts Sections 26.1-47-08 and 26.1-47-09(3) of the North Dakota Century Code. In addition, the Court will address the applicability of the McCarran-Ferguson Act's reverse preemption provision.

1.    **N.D.C.C § 26.1-47-09(3)**

Guardian Flight contends Section 26.1-47-09(3) of the North Dakota Century Code is a clear attempt to regulate air ambulance service providers. Guardian Flight further contends that because the law affects the reimbursement rates for air ambulance service providers, the law is preempted by the ADA. The State contends application of the ADA's preemption provision would be bad

public policy because market forces are not at work when an air ambulance is needed and the Payment Provision only regulates the insurance relationship between patient and insurer. A careful reading of Section 26.1-47-09(3) in light of *Morales, Wolens,* and *Ginsberg,* reveals the State's position to be untenable.

State laws and regulations "having a connection with or reference to airline rates, routes, or services, are pre-empted" by the ADA. Morales, 504 U.S. at 384. The phrase "relating to" in the ADA preemption clause has been construed very broadly. Morales, 504 U.S. at 384. For instance, the ADA has been found to preempt a New York law which required airlines to provide fresh air, restroom, water, and food to passengers subject to lengthy ground delays. Air Transport Ass'n of Am. v. Cuomo, 520 F.3d 218, 222 (2nd Cir. 2008) (finding the required accommodations related to the service of an air carrier).

Insofar as the State contends the ADA does not preempt state laws regulating air ambulances because it makes poor public policy and market forces are not at play, the Court finds the argument unpersuasive, unsupported by case law, and contrary to *Morales*, *Wolens*, and *Ginsberg* which broadly construed the ADA's preemption provision. See Watson v. Air Methods Corp., 870 F.3d 812, 817 (8th Cir. 2017) (noting there is no presumption against preemption and ADA preemption applies to both generally applicable state law and state laws which specifically apply to air carriers); EagleMed LLC v. Cox, 868 F.3d 893, 904 (10th Cir. 2017) (rejecting a policy based argument for excluding air ambulances from ADA preemption). The plain language of the ADA preemption provision which preempts state laws "related to a price, route, or service" forecloses the State's policy argument. 49 U.S.C. § 41713(b)(1). In addition, and perhaps more importantly, this Court found in *Dwelle* that the ADA applies to air ambulance service providers. Dwelle, 171 F. Supp. 3d

at 941. State laws which significantly impact air carrier rates are clearly preempted by the ADA. Morales, 504 U.S. at 384. There is no ADA exception for air ambulances, and this Court will not imply one.

Numerous federal courts have ruled that state laws limiting or regulating air ambulance prices and services are preempted by the ADA. See Cox, 868 F.3d at 907 (finding the ADA preempts worker's compensation fee schedule for air ambulance services); Air Evac EMS, Inc. v. Cheatham, No. 2:16-cv-05224, 2017 WL 4765966, at *8 (S.D. W.Va. Oct. 20, 2017) (finding the ADA preempts state statutory caps on reimbursement for air ambulance services); Schneberger v. Air Evac EMS, Inc., No. CIV-16-843-R, 2017 WL 1026012, at *2-*6 (W.D. Okla. Mar. 15, 2017) (finding the ADA preempted a state common law challenge to the reasonableness and fairness of air ambulance charges); Bailey v. Rocky Mountain Holdings, LLC, 136 F. Supp. 3d 1376, 1379-82 (S.D. Fla. 2015) (holding the ADA preempts state consumer protection claims as applied to air ambulance prices); PHI Air Med., LLC v. Texas Mut. Ins. Co., 549 S.W.3d 804, 811 (Tex. App. 2018) (finding the ADA preempts state law limits on reimbursement payments to air ambulance providers). Good intentions do not save state legislation intended to protect patients from exorbitant air ambulance bills from ADA preemption.

In this case, the impact of Section 26.1-47-09(3) on Guardian Flight's prices is clear and significant as it caps air ambulance prices. The law states "a payment made by an insurer . . . is considered a full and final payment by the insured for out-of-network air ambulance services billed to the insured." N.D.C.C. § 26.1-47-09(3). The law mandates that when Guardian Flight is out of network with the insurer it must accept as payment in full the payment made by the insurer as long as that payment complies with Section 26.1-47-09(1). In effect, Guardian Flight must accept the

state-mandated rate and no balance billing is permitted. Obviously then, the law relates to air ambulance rates. There can be no question that such interference with air ambulance rates and prices is precisely the type of state regulation Congress sought to prevent when it included an express preemption clause in the ADA. Morales, 504 U.S. at 378. Placing the law in Title 26.1, which regulates insurance, does not save it from preemption. It is a law's effect, rather than its form, which is of critical importance in the preemption analysis. Ginsberg, 134 S. Ct. at 1430.

The Court concludes, as a matter of law, that Section 26.1-47-09(3) of the North Dakota Century Code is preempted by the Airline Deregulation Act of 1978. While the policy choices the State is attempting to impose in Section 26.1-47-09(3) are well-intentioned, the enactment once again misses the mark by focusing on air ambulance charges and limiting the amount which is considered a full and final payment, rather than focusing on the percentage of the charges the insurance provider must pay. Congress has assumed the field in the area of air carrier regulation. Insurance regulation remains the province of the states. If the State wishes to protect patients who need air ambulance services it would do well to mandate insurance providers pay a larger percentage of the charges rather than trying to regulate how much the air ambulance bills for its services. If Congress believes patients are in need of protection from out-of-control air ambulance rates, and they surely are out of control, it may act to exclude air ambulance service providers from the ADA or provide some other form of relief.


2.      **N.D.C.C § 26.1-47-08**

Guardian Flight also contends the ADA preempts North Dakota Century Code § 26.1-47-08, because the law relates to the prices that air ambulance service providers may charge in North

Dakota. The Subscription Provision prohibits air ambulance service providers from offering or selling air ambulance subscription agreements. Generally speaking, such subscription agreements require an annual fee which then exempts the member from any co-pays or balance billing the member might otherwise be responsible for if the member uses an air ambulance. The only argument the State offers in opposition to Guardian Flight's contention is that the State retains the authority to regulate insurance and the McCarran-Ferguson Act reverse preemption provision saves it from preemption because the State is regulating insurance. The Court will address that issue below. Clearly, the Subscription Provision relates to air ambulance rates and services as it prohibits subscription agreements which directly impacts charges for air ambulance services. The Court finds ADA preemption applies to the Subscription Provision unless the McCarran-Ferguson Act analysis alters the conclusion.

### B.    McCARRAN-FERGUSON ACT REVERSE PREEMPTION

The State contends McCarran-Ferguson Act ("MFA") saves both the Subscription Provision and the Payment Provision from preemption as both provisions regulate insurance. Guardian Flight maintains neither provision regulates the business of insurance or the relationship between insurer and policyholder.

The McCarran-Ferguson Act was enacted to assure states the preeminent role in the regulation of the insurance industry. U.S. Dep't of Treasury v. Fabe, 508 U.S. 491, 500 (1993) (holding an Ohio statute governing priority of claims against an insolvent insurer was enacted for the purpose of regulating the "business of insurance" and thus the McCarran-Ferguson Act saved the Ohio statute from preemption by the federal priority statute). The "reverse preemption" clause of

the McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the <u>business of insurance</u>, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b) (emphasis added). "The McCarran-Ferguson Act thus precludes application of a federal statute in face of state law 'enacted ... for the purpose of regulating the business of insurance,' if the federal measure does not 'specifically relat[e] to the business of insurance,' and would 'invalidate, impair, or supersede' the State's law." <u>Humana Inc. v. Forsyth</u>, 525 U.S. 299, 307 (1999) (internal citations omitted) (holding McCarran Ferguson Act did not preclude application of federal RICO laws, which did not specifically relate to the business of insurance, because the Nevada insurance laws in question were not impaired by RICO). In other words, under the McCarran-Ferguson Act a state law reverse preempts federal law if (1) the federal statute does not specifically relate to the business of insurance; (2) the state law was enacted for the purpose of regulating the business of insurance; and (3) the federal statute operates to invalidate, impair, or supersede the state law. <u>Id.</u>; <u>Doe v. Norwest Bank Minn. N.A.</u>, 107 F.3d 1297, 1305 (8th Cir. 1997). Only the second prong of this test is at issue in this case.

Laws aimed at protecting or regulating the relationship between the insurer and the insured, whether directly or indirectly, are considered laws which regulate the "business of insurance." <u>Fabe</u>, 508 U.S. at 501. The focus of the McCarran-Ferguson Act is the relationship between the insurance carrier and the policyholder. <u>Id.</u> This relationship includes both the writing and performance of insurance contracts. <u>Id.</u> at 503. The Supreme Court has identified three criteria relevant in determining whether a particular enactment regulates the "business of insurance" within the meaning of the McCarran-Ferguson Act: "*first*, whether the practice has the effect of transferring or spreading

a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry." Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129 (1982) (holding an insurance company's use of a chiropractic professional association's peer review committee, to determine whether chiropractic treatments and charges were necessary and reasonable, did not constitute the "business of insurance" within the meaning of the McCarran-Ferguson Act and thus the practice was not exempt from scrutiny under federal anti-trust law). In this case we consider not an insurance industry practice but a state law and whether it regulates the business of insurance.

The State, citing *Fabe* and *Doe*, contends the three-part Pireno test only applies in antitrust cases and thus should not be applied in this case. However, language from *Doe* which the State seizes on is dicta contained in a footnote. Doe, 107 F.3d at 1305 n. 8. In a later case, the Eighth Circuit approved the district court's application of the *Pireno* test in a non-antitrust case. Standard Sec. Life Ins. Co. of N.Y. v. West, 267 F.3d 821, 823 (8th Cir. 2001). Other circuit courts have also approved the use of the *Pireno* test in non-antitrust cases. See Autry v. Northwest Premium Servs., Inc., 144 F.3d 1037, 1040-41 (7th Cir. 1998) (finding the three-part *Pireno* inquiry the appropriate test for non-antitrust cases); Bailey v. Rocky Mountain Holdings, LLC, 889 F.3d 1259, 1273 (11th Cir. 2018) (applying the three-part *Pireno* test and finding MFA reverse preemption did not save a Florida balance billing law affecting air ambulances from the ADA's preemptive effect). In addition, this Court applied the *Pireno* test in *Dwelle* without any objection from the parties. The Court finds the *Pireno* factors relevant and helpful and the appropriate test in both anti-trust and non-antitrust MFA cases. For this reason, the Court will apply them.

### 1.    N.D.C.C. § 26.1-47-09(3)

The State contends the Payment Provision was enacted for the purpose of regulating the "business of insurance" and thus the ADA's express preemption clause is reverse preempted by the MFA. Guardian Flight maintains the Payment Provision was not enacted for the purpose of regulating the "business of insurance" but rather was enacted to regulate the prices charged by air ambulance service providers.

The State's position is unpersuasive. The structure and text of Payment Provision clearly demonstrate it does not regulate the "business of insurance" as that phrase is used in the McCarran-Ferguson Act. Rather, the clear purpose of Payment Provision is to limit the ability of air ambulance service providers to collect the portion of the bill not covered by insurance directly from the patient.

The first prong of the *Pireno* test addresses whether the law has the effect of spreading or transferring the policyholder's risk. The transfer of risk is complete when the contract of insurance is entered. Fabe, 508 U.S. at 503. The actual performance of an insurance contract, including enforcement of the contract, constitutes the "business of insurance." Fabe, 508 U.S. at 503. The regulated practice here is the billing and pricing practices of air ambulance services, not the performance of an insurance contract. See Bailey, 889 F.3d at 1274. The Payment Provision does not have any impact on the allocation of risk between the insurance carrier and the policyholder. Rather, it caps payments for air ambulances and prohibits balance billing. This is not the spreading of risk between the insured and insurer that the first *Perino* factor speaks to. A law which spreads the policyholders risk to the provider does not regulate "the business of insurance." Bailey, 889 F.3d at 1274.

The second prong of the *Pireno* test asks whether the law regulates an important part of the

18

relationship between the insurer and insured. The relationship between the insurer and the insured lies at the core of the "business of insurance." Fabe, 508 U.S. at 501. The focus in the second prong of the *Pireno* test is the contract between the insurer and the insured. Pireno, 458 U.S. at 128. Prescribing the terms of an insurance contract is a direct regulation of the "business of insurance". Fabe, 508 U.S. at 502-03. While the Payment Provision does mandate some language to be included in all health insurance policies, the effect of the language is directed at a third-party service provider's ability to receive payment once the insurer has discharged any obligations it has to pay for an air ambulance under the insurance policy. Thus, the Payment Provision does not regulate the relationship between insurer and insured. Bailey, 889 F.3d at 1274.

The third prong of the *Pireno* test asks whether the law is limited to entities in the insurance industry. The Payment Provision is clearly aimed at the billing activities of air ambulances. A service providers is a third-party to the contract between the insurer and the insured. As the Supreme Court has explained, an insurer's arrangements with third-party providers are merely cost-saving measures that reduces the insurer's cost of covering a loss that it was already obligated to cover. Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 214 (1979) (holding an insurer's agreement with participating pharmacies to provide low cost prescription drugs to policyholders was not the "business of insurance" so as to exempt the pharmacy agreements from scrutiny under the MFA).

The MFA's focus is on the relationship between the insurance carrier and the policyholder. Fabe, 508 U.S. at 501. All three *Pireno* factors indicate the Payment Provision does not regulate the "business of insurance." An individual has a relationship with the provider as a patient and a relationship with the insurance carrier as a policyholder. As is often the case, the air ambulance

service provider charges too much and the insurance carrier pays too little. The individual is caught in the middle and one of the three parties involved is going to lose the struggle to see who must pay or absorb the loss. In the final analysis, the Payment Provision is aimed at protecting the patient from the air ambulance service provider by capping the amount the provider may collect from the patient. In effect, prohibiting balance billing. If the provider's billings are capped the provider must absorb the loss. The Payment Provision does not require the insurer to pay more of the charged billing. Since the Payment Provision alters the relationship between the provider and the patient rather than the insured and the insurer, its focus is not on the "business of insurance" or "adjusting, managing, or controlling the business of insurance." Fabe, 508 U.S. at 505; Bailey, 889 F.3d at 1274. The Court concludes as a matter of law that the Payment Provision was not enacted for the purpose of regulating the "business of insurance" and thus is not saved from ADA preemption by the MFA.

### 2. N.D.C.C. § 26.1-47-08

The State contends subscription agreements are a form of insurance and the Subscription Provision was enacted for the purpose of regulating them. The law provides that "[a]n air ambulance provider, or an agent of an air ambulance provider, may not sell, solicit, or negotiate a subscription agreement or contract relating to services or the billing of services provided by an air ambulance provider." N.D.C.C. § 26.1-47-08. Guardian Flight contends subscription agreements it offers are not insurance. See doc. No. 1-1. Thus, the only question the Court need resolve is whether the subscription agreements banned by Section 26.1-47-08 are a form of insurance. By any reasonable definition, the subscription agreements banned by Section 26.1-47-08 are a form of insurance.

Insurance is "[a] contract by which one party (the insurer) undertakes to indemnify another party (the insured) against risk of loss, damage, or liability arising from the occurrence of some specified contingency.  Insurance, Black's Law Dictionary (10th ed. 2014).  Put another way,

> [I]nsurance is a contract by which one party (the insurer), for a consideration that usually is paid in money, either in a lump sum or at different times during the continuance of the risk, promises to make a certain payment, usually of money, upon the destruction or injury of "something" in which the other party (the insured) has an interest."

1 Steven Plitt et. al., Couch On Insurance § 1:6 (3d ed. 2018).  In North Dakota, an insurance contract is defined as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from an unknown or contingent event." N.D.C.C. § 26.1-29-01.  An accident and health insurance policy is "any contract policy insuring against loss resulting from sickness or bodily injury, or death by accident, or both."  N.D.C.C. § 26.1-36-02.  "An insurer is a person who undertakes to indemnify another by an insurance contract and the insured is the person indemnified." N.D.C.C. § 26.1-29-02.  "Anyone who is capable of making a contract, except as restricted by law, may be an insurer, and anyone except a public enemy may be an insured."  N.D.C.C. § 26.1-29-03.

There is no dispute subscription agreements are contracts.  And it is clear they spread risk.  For a fee, the air ambulance agrees the patient who uses an affiliated air ambulance will incur no out-of-pocket expenses.  Whether a member will ever need the services of an air ambulance is the contingent event upon which the contract is based.  The air ambulance agrees to seek reimbursement only from the patient member's insurer or another third party who may be responsible.  This is the only benefit conferred by the contract.  The air ambulance assumes the member's risk.  The vast majority of members will never need to use an air ambulance.  The air ambulance will collect fees from many members but will only transport a very few.  The air ambulance is assured a steady

stream of revenue. The risk of an enormous bill is spread as many will pay a manageable fee so that no one person is faced with a catastrophic bill and the air ambulance provider will assume the risk that multiple members will need their services. The Subscription Provision alters the relationship between the air ambulance and the member by entirely prohibiting air ambulances from selling subscription agreements and the provision only applies to air ambulance service providers. The Court concludes such an arrangement is a form of insurance. See Love v. Money Tree, Inc., 614 S.E.2d 47, 49 (Ga. 2005) (finding auto club memberships were insurance and the MFA reverse preempted the Federal Arbitration Act).

The strenuous denials of Guardian Flight aside, if a bird looks like a duck, swims like a duck, and quacks like a duck, a reasonable person can only conclude that it is indeed, a duck. Simply and repeatedly saying a contract is not a contract of insurance does not make it so. A Costco membership does not shift risk, but rather confers a immediate certain benefit of entry into the member stores and the privilege of purchasing the goods for sale in the stores. The Court rejects Guardian Flight's contention that the contract in question is one for contingent services rather than insurance.

> Care must be taken to distinguish mere contracts to render service on the happening of a contingency from true contracts of insurance. The cases have failed to declare a satisfactory rule for distinguishing between the two types of agreements, but it would seem that the contract should not be classed as insurance if the paramount purpose in its formation was to be the rendition of the services rendered. However, it should be insurance if the chief purpose of the agreement is the protection against the risk involved.

Jordan v. Grp. Health Ass'n, 107 F.2d 239, 248 n.26 (D.C. Cir. 1939) (internal quotations and citations omitted and emphasis added). In this case, the clear purpose of the subscription agreement is not the provision of a service, but rather to protect against the risk of a catastrophic billing for the use of an air ambulance. Such balance billings can run as high as $80,000. See Doc. No. 7-1. The

Court has no difficulty concluding air ambulance subscription agreements are a form of insurance.

In the final analysis, we have a contract which, for a small fee, does nothing more than shift the risk of an unforeseeable contingent event from the member to the air ambulance. If the contingent event occurs, the air ambulance will indemnify the member against any costs not covered by the member's medical insurance. See N.Y. General Counsel Opinion 7-7-2008, 2008 WL 3917516 (July 7, 2008) (opining that air ambulance subscription plans are insurance contracts under New York law[1]). This is, by all definitions, insurance, or more specifically, supplemental insurance. The Subscription Provision, which prohibits air ambulance service providers from selling subscription agreements,[2] was clearly enacted "for the purpose of regulating the business of insurance." Thus, the MFA applies to save the Subscription Provision from preemption by the ADA.

## IV.    CONCLUSION

For the reasons set forth above, the Plaintiff's motion for judgment on the pleadings (Doc. No. 10) is **GRANTED in part and DENIED in part** as set forth above. The Defendants' motion for judgment on the pleadings (Doc. No. 14) is **GRANTED in part and DENIED in part** as set forth above. The alternative motion for summary judgment (Doc. No. 17) is **DENIED as moot**. The

---

[1]New York defines an insurance contract as "any agreement or other transaction whereby one party, the "insurer", is obligated to confer benefit of pecuniary value upon another party, the "insured" or "beneficiary", dependent upon the happening of a fortuitous event in which the insured or beneficiary has, or is expected to have at the time of such happening, a material interest which will be adversely affected by the happening of such event." N.Y. Ins. Law § 1101(a). This definition, although lengthier, is very similar to North Dakota's definition and those found in Couch on Insurance and Black's Law Dictionary cited above.

[2]It is unclear why North Dakota has chosen to prohibit the practice when there is a clear need to address the affordability of air ambulance services. Montana, for instance, has taken the opposite approach. See Mont. Code Ann. § 50-6-320. Washington has a similar law. Wash. Rev. Code Ann. § 48.01.280. Other states have exempted the practice from the definition of insurance. See Ariz. Rev. Stat. Ann. § 20-103; Ga. Code Ann. 33-1-21.

Defendants, their employees and agents, are permanently enjoined from enforcing or seeking to enforce Section 26.1-47-09(3) of the North Dakota Century Code. Let judgment be entered accordingly.

**IT IS SO ORDERED.**

Dated this 14th day of January, 2019.

/s/  Daniel L. Hovland
Daniel L. Hovland, Chief Judge
United States District Court